A

Not Reported in F.Supp.2d
(Cite as: 2001 WL 15693 (S.D.N.Y.))

Page 1

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

THE FIRST NATIONAL BANK OF CHICAGO,
Plaintiff,
v.
ACKERLEY COMMUNICATIONS, INC.,
Defendant.

No. 94 Civ. 7539(KTD).

Jan. 8, 2001.

Richard I. Janvey, Nicholas R. Weiskopf, Janvey, Gordon, Herlands, Randolph, Rosenberg & Cox LLP, New York, New York, John C. Simons, the First National Bank of Chicago, Chicago, Illinois, for Plaintiff.

Jeffrey Harris, Rubin, Winston, Diercks, Harris & Cooke, LLP, Washington, DC, for Defendant.

*OPINION*

DUFFY, J.

*1 This lawsuit, brought by Plaintiff First National Bank of Chicago ("First Chicago") against Defendant Ackerley Communications, Inc. ("Ackerley") centers around an interest rate swap with a two year option to extend. First Chicago alleged that Ackerley breached this contract by refusing to accept timely notice of the bank's election to extend the agreement and subsequently failing to make payments called for under the agreement. Ackerley maintains, however, that it did not receive effective notice of the decision to exercise the option. The parties stipulated to certain facts in a joint pre-trial order. I heard testimony and received evidence at a two day bench trial of this matter on December 5-6, 2000. The following constitute my findings of fact and conclusions of law.

An understanding of this transaction and the arguments raised by the parties depends first upon an understanding of the underlying interest rate swap arrangement. First Chicago attempted to explain the arrangement through the testimony of John Anderson ("Anderson"), an interest rate derivatives trader:

Assume that [a corporation rated] AAA can borrow at a fixed rate of interest of 8.50 or they can borrow at a floating rate of LIBOR plus .25.... [A corporation rated CCC] can borrow at 9.50 on a fixed rate of interest or LIBOR plus 1 percent.

In both cases CCC has to pay more money to borrow money than AAA.... [T]hey would have to pay floating plus 1 percent or 9.50, AAA could pay Floating plus .25 percent or 8.50. But AAA has a comparative advantage if they always borrow fixed at 8.50 and ... CCC borrows money at LIBOR plus 1 percent.

Imagine that CCC, or Ackerley in this case, ... doesn't want to borrow floating, because they want to know what their interest rate payments are going to be in the future. They want to lock in that cost. So they would rather be fixed. Then they come to a bank, and this is where the bank sits in the middle, and they do a swap to change this from a floating rate of interest to a fixed rate of interest. So the bank will pay them this LIBOR plus 1 percent, and then CCC will pay the bank a floating rate of interest, and we can make it 9.40....

AAA then has to decide that they have enough fixed rate debt, they would rather have floating rate debt, but they issue fixed anyway, because they can then go to the bank and the bank will pay them 8.50 and they pay the bank LIBOR plus .15. Now, this fixed rate of interest 8.50 and this fixed rate of interest cancel each other out, so the payments are exactly identical, so there is no net payment there. The bank pays it to AAA, who passes it through to their investors. They still have this money, so they have to pay the bank some interest rate, and they pay LIBOR plus .15.

The exact opposite with CCC. We pay them LIBOR plus 1.00, they pay LIBOR plus 1.00 to the investors. That nets out to zero, as does this. But they are left paying us a fixed rate of interest of 9.40.... The bank is paying 8.50 to AAA, it is receiving 9.40 from CCC, so the bank is making .9 percent.

*2 ....

... And on the floating the bank is paying LIBOR plus 1.00 and it is receiving LIBOR plus .15. So it is net paying out 85 basis points. The bank keeps this 5 basis point spread by finding these two counterparties, putting them together, and then taking the ongoing administrative risk and credit risk of having these two swaps on.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 15693, *2 (S.D.N.Y.))

Page 2

(Tr. at 121-23.) It is upon this purely theoretical model that First Chicago bases its case and particularly its assertion and computation of damages. This explanation might work well in a purely theoretical forum, but it ignores reality.

Here, First Chicago never tried to act as intermediary between two customers. First Chicago undertook to sell either half of the theoretical swap to a customer with the bank taking the entire risk of the other side. First Chicago could not and did not point to any countervailing swaps to the one in question since, in fact, there were none. The bank had assumed all the risk and, of course, in assuming all the risk the bank took all the profit.

One might ask what is the economic motive for a borrower to get involved in this arrangement. Essentially, the borrower is looking for insurance against wild swings in the going interest rates and the ability to forecast its interest payments. In view of the fact, then, that there is no real swap, one might analogize this to the bank issuing an insurance policy and receiving a variable premium.

It is true that a good options portfolio manager would insist upon swap options on both sides of the theoretical model; and depending upon the direction of the market rate, would favor one or the other. It is clear, however, that in this case the bank took all of the profits and all of the risk.

Good financial management merely demanded that the bank "hedge" its "over-all" risk with a macro-hedge such as suggested by Anderson. (Tr. at 139.) This macro-hedge, however, was a hedge against all of the bank's liabilities and was not restricted to the swap arrangement entered into with Ackerley. To suggest that the bank lost money into its macro-hedge because of the Ackerley transaction is to engage in speculation which approaches pure fantasy.

Facts

On June 20, 1989 First Chicago and Ackerley entered into the interest rate swap agreement (the "Swap Agreement"). Under the terms of this agreement, First Chicago had the unilateral right to extend the Swap Agreement for a two year period beyond the termination date of June 22, 1994 (the "Option"). [FN1] In order to exercise the Option, First Chicago needed to notify Ackerley on or before June 20, 1994 of its election to change the termination date. The crucial issue at trial was whether First Chicago effectively notified Ackerley of its decision to exercise this option. The Swap Agreement by its terms is governed by New York law and this Court has diversity jurisdiction under 28 U.S.C. § 1332.

> FN1. Plaintiff's witness insisted on classifying the Swap Agreement as a seven year agreement with an option to terminate at the end of the fifth year, proposing that this distinction makes little difference. I disagree. The actual language of the Swap Agreement, which describes the Option as an option to extend, dictates an interpretation of the Swap Agreement as a five year contract with a unilateral right to extend for an additional two years. This reading demands that the Agreement automatically terminate at the end of year five, regardless of prevailing rates.

Prior to the Swap Agreement, First Chicago arranged a syndicated loan for Ackerley. This loan had a floating interest rate. (Tr. at 68.) Thereafter, in 1989, Kenneth Selle ("Selle"), an officer in First Chicago's Loan Sales Syndication Department, put Ackerley executives in contact with the First Chicago Global Derivatives Group. Analysts in the Global Derivatives Group then sold the Swap Agreement to Ackerley, as a means of decreasing risk stemming from the fluctuation of interest rates connected to Ackerley's floating rate obligations. (Tr. at 87.)

*3 Under the terms of the Swap Agreement (dictated solely by First Chicago), Ackerley was to pay First Chicago a fixed 8.8 percent interest on a $15 million notional amount. (Pl.'s Ex. 2.) At the time the Swap Agreement was signed, the floating rate was calculated at 9.4375 percent. The difference between these two rates meant that First Chicago paid .6375 percent interest on the Notional Amount, or $95,625.00, to Ackerley on the first payment date following execution of the Swap Agreement. Over the five year term of the Swap Agreement, however, interest rates dropped, such that Ackerley made more payments to First Chicago than First Chicago made to Ackerley. (Tr. at 81.)

As mentioned above, the Option provided by the Swap Agreement granted First Chicago the unilateral right to extend the swap for an additional two years under the same terms as were in force during the initial five years. Interest rate swaps with

this kind of option have come to be known as "swaptions." (Tr. at 80.) In this case, the Option expired on June 20, 1994. Notice of First Chicago's intent to exercise the Option had to be given to Ackerley by the end of business on that day in order to extend the Swap Agreement from June 22, 1994 to June 22, 1996.

Jonathan Lance ("Lance"), a vice-president in First Chicago's Global Derivatives Group at the time in question, asserted that he attempted to reach Denis Curley ("Curley"), Chief Financial Officer of Ackerley, by phone on the afternoon of June 20. (Tr. at 15.) Unable to find Curley or "someone else who was backing him up," [FN2] Lance prepared a facsimile cover sheet and one page letter notifying Ackerley of the bank's decision to exercise the Option. (Tr. at 16.) Lance instructed Patrick Hennelly ("Hennelly"), a marketing analyst in the Global Derivatives Group, to fax this notice to Ackerley. (Tr. at 18.) Hennelly testified to placing the two sheets on the fax machine, dialing the fax number, and pressing "Enter, Go, Send, whatever the button was relevant on that machine." (Tr. at 54.) Hennelly returned some time later and retrieved the original document from the output tray of the fax machine. (Tr. at 55.)

> FN2. While I have no reason to doubt that Lance attempted to reach Curley by phone, there is no evidence that he asked to leave a message for Curley, despite the alleged importance of this transaction to First Chicago.

On June 20, 1994 Curley and Keith Ritzmann ("Ritzmann"), Controller for Ackerley, discussed whether either of them "had received anything from First Chicago indicating their intent to exercise that option." (Tr. at 98.) Ritzmann then asked Curley's assistant, Mary Robertson ("Robertson") if any correspondence from First Chicago had arrived. (Tr. at 98.) Robertson asked the secretaries in the office whether "anything" had arrived from First Chicago. (Tr. at 107.) To the best of her knowledge, nothing had been delivered from First Chicago at that time.

Two days later Lance received a phone call from Selle regarding First Chicago's failure to exercise the Option. (Tr. at 19.) There are two versions of this phone call. According to Lance's testimony, this was the first he heard of any problem with the notice he had prepared on June 20. (Tr. at 18.) Lance recounted that he was called by Selle because Selle received a call from Curley "who had not received the fax outlining First Chicago's right to extend the swap for two more years." (Tr. at 19.) At the instruction of Laurie Walsh, the head of documentation for the Global Derivatives Group, Lance then refaxed the letter to Curley. (Tr. at 20.)

*4 Selle, however, painted a different picture of June 22, 1994. According to Selle, Curley called him on June 22 specifically because Ackerley "had received a fax from the derivatives department on that day notifying [Ackerley] of extension of the option." (Tr. at 70.) As this notice was untimely, Curley called Selle to inform him that it was too late to exercise the Option. Tr. at 70.) Selle then called Lance to inquire why notice was sent on June 22. (Tr. at 70.) Lance informed him "that [First Chicago] had extended another fax out to the company regarding the extension." (Tr. at 70.) I find Selle's version of the conversation to be the more credible statement of what happened, but such a determination is unnecessary for purposes of this decision.

Shortly thereafter, Jackie Hurlbutt, a senior executive with First Chicago, flew to Seattle to meet with Curley and Barry Ackerley, the President and CEO of Ackerley. (Tr. at 85.) Over lunch Ms Hurlbutt attempted to persuade Ackerley to accept the late notice and continue payments under the Swap Agreement. (Tr. at 86.) Ackerley refused and this litigation followed.

## Discussion

The Swap Agreement consisted of two documents: a 1987 version of the International Swap Dealers Association ("ISDA") [FN3] Interest Rate and Currency Exchange Agreement (the "1987 ISDA Master Agreement") and a confirmation providing specifics for this particular interest rate swap (the "Confirmation"). At the time the ISDA designed this Master Agreement, First Chicago was a major player in the industry group. The Confirmation was prepared solely by First Chicago. Both documents were signed by First Chicago and Ackerley. The 1987 ISDA Master Agreement did *not* provide for facsimile transmission as an acceptable means of notification between the parties. The contract between the parties specifically provided:

> FN3. ISDA, which now stands for International

Not Reported in F.Supp.2d
(Cite as: 2001 WL 15693, *4 (S.D.N.Y.))

Page 4

Swaps and Derivatives Association, Inc., is the global trade association representing leading participants in the privately negotiated derivatives industry. As part of its effort to identify and reduce the sources of risk in the derivatives and risk management business, the ISDA developed a master agreement for interest rate and currency exchange swaps.

Any notice or communication in respect of this Agreement will be sufficiently given to a party if in writing and delivered in person, sent by certified or registered mail (airmail, if overseas) or the equivalent (with return receipt requested) or by overnight courier or given by telex (with answerback received) at the address or telex number specified....

There is absolutely no proof that First Chicago attempted notification of Ackerley by any of the means listed in the contract. Failure to give the required notice defeats First Chicago's entire claim. *See Kaplan v. Lippman,* 75 N.Y.2d 320, 324-25, 552 N.E.2d 151, 552 N.Y.S.2d 903 (1990)(stating that the optionee must exercise the option in accordance with its terms and in the manner specified in the option). It is hornbook law that when the terms of a written contract are clear and unambiguous and those terms require written notification in a particular manner then such notification can be given only in that manner. *See* 22 N.Y. Jur Contracts § 214; *see also* Farnsworth on Contracts § 3.23a (1998)("Because an option is a contract ... the time for exercise of the option is subject to the rules on conditions, including the rules relating to waiver of conditions."); *Cruden v. Bank of New York,* 957 F.2d 961, 976 (2d Cir.1992)("Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed.").

*5 First Chicago attempts to excuse its failure to give the requisite notice by arguing that its written contract with Ackerley had changed due to changes in industry practice. By June 20, 1994, a revised ISDA Master Agreement had been developed (the "1992 ISDA Master Agreement"). This version of the ISDA Master Agreement did provide for notification by facsimile in limited circumstances. First Chicago argues that by 1994 it was industry practice for derivatives market-makers to notify their clients of the decision to exercise an option by fax. (Tr. at 45.) Even under the provisions of the 1992 ISDA Master Agreement, First Chicago bears the burden of proving that such fax notification was effective and in this it has totally failed.

Section 10(a)(iii) of the 1992 ISDA Master Agreement provides that notice is effective:
if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine).
Notice by facsimile is not effective, however, to communicate (i) events of default and termination or (ii) early termination. (1992 ISDA Master Agreement § 10(a))

First Chicago is unable to satisfy this burden. The provision specifically states that this burden will not be satisfied by mere production of a facsimile transmittal report. [FN4] There is no convincing evidence that the events of June 20, 1994 transpired as portrayed by First Chicago. First Chicago attempted to satisfy its burden by producing a witness who testified that he "would have put the fax into the machine and pushed it through." (Tr. at 54.) This person, however, did little more than place the papers in the machine's feeder, hit "start," walk away, and retrieve the papers on the others side some time later. (Tr. at 64.) This witness, though not unbelievable, cannot attest to the proper sending of the fax in question.

FN4. First Chicago is unable to produce even this insufficient piece of evidence, and alleges that the fax machine in question, located on the Global Derivatives floor in the First Chicago offices, is unable to produce such reports.

First Chicago also relies on the stipulated fact that there was a 1.1 minute connection between the First Chicago fax machine and the fax machine in Ackerley's Seattle headquarters. Although a connection between these two machines may have been made, there is no evidence that the fax was properly transmitted or what that fax might have been. Accepting First Chicago's version of the story requires a finding that Robertson's testimony was false. No part of Robertson's testimony leads me to believe that she was untruthful.

Additionally, the sequence of events on June 22,

1994 does not support First Chicago's version of what happened on June 20, 1994. Accepting as true the fact that Curley received the fax prior to contacting Selle, [FN5] I find that First Chicago would have no reason to re-send the fax in question absent a belief that there was a problem with the earlier transmission. Under its second argument First Chicago has failed entirely to satisfy its burden of proof.

> FN5. In this regard, I find the straight forward testimony of Selle infinitely more believable than the hedged and cagey answers given by Lance as to the chronology of events on June 22, 1994.

*6 Finally First Chicago fell back on the argument that the occasional late notification of the exercise of an option is always accepted. (Tr. at 178.) Even were this true, I will not set aside the explicit language of the Confirmation, calling for notice by June 20, 1994, in favor of suspect industry practices. *See Croce v. Kurnit,* 737 F.2d 229, 238 (2d Cir.1984) (stating that "evidence of industry practice may not be used to vary the terms of a contract that clearly sets forth the rights and obligations of the parties."); *In re Western Union Telegraph Co.,* 299 N.Y. 177, 184-85, 86 N.E.2d 162, 166 (1949) (same).

Damages

While it may be unnecessary, in view of the foregoing, to discuss First Chicago's failure to prove damages, I do so for the sake of completeness. First Chicago does not claim a loss of profits; rather its claim to damages is based on the theoretical model of a swap agreement and the claim that First Chicago paid out to someone an amount equal to the other half of the swap. Of course at no time did First Chicago identify to whom such payment was made.

On the issue of damages, I was disturbed by First Chicago's apparent withholding of relevant evidence in the face of Ackerley's document requests. During discovery Ackerley twice requested all information regarding the calculation of damages. (Tr. at 146.) In response, First Chicago prepared a simple two-column table indicating the dates and amounts for payments that would have been made by Ackerley to First Chicago had the Option been properly exercised. (Pl.'s Ex. 4.) These calculations do not set out the floating interest rate at the time of hypothetical payment. [FN6] Neither do they incorporate the fixed interest rate payments that First Chicago would have made on the complementary side of the hedge if there had been a complementary side to the swap. No other documents responsive to the requests were produced. Yet, Anderson, a trader on the interest rate derivatives trading desk at Bank One, [FN7] referred to an accounting document which indicated the loss taken by First Chicago on Ackerley's refusal to accept the Option. (Tr. at 160.) Although this document was in the possession of First Chicago's counsel, it was never turned over to Ackerley.

> FN6. First Chicago apparently expected Ackerley to calculate the interest rate by "backing it out" or doing the research itself. This response exemplifies the unprofessionalism with which First Chicago's counsel approached this trial. It also misses the point completely. A discovery request calling for the calculation of damages requires more than merely setting forth the figure demanded, which is, in essence, what First Chicago produced. Fed.R.Civ.P. 26(a)(1)(C) provides that as part of initial disclosure, a party shall provide to other parties "a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered...." Plaintiff's Exhibit 4 does not satisfy this requirement.

> FN7. Bank One is the survivor entity of the First Chicago merger with Bank One.

Ultimately, there is no conclusive evidence of any damages in this case. First Chicago's alleged damages expert, Anderson, was in reality no more than a fact witness, and more importantly, was wholly unbelievable. His insistence on speechifying from the witness stand rather than answering the questions asked discredited his testimony entirely.

Even the casual student of the law of contracts knows that the plaintiff's proof of damages in a breach of contract claim includes of necessity proof of mitigation of those damages either attempted or achieved by plaintiff. *See Wilmot v. New York,* 32 N.Y.2d 164, 168, 297 N.E.2d 90, 344 N.Y.S.2d 350 (1973) (stating that the party seeking damages is under a duty to make reasonable efforts to avoid consequences of the act complained of); *Middle*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 15693, *6 (S.D.N.Y.))

Page 6

*East Banking Co. v. State Street Bank Int'l*, 821 F.2d 897, 902 (2d Cir.1987) ( "It is beyond dispute that New York requires injured parties to take reasonable steps to minimize damages."). Here there was not even an attempt to prove any mitigation of damages for the simple reason that there were no damages paid out by First Chicago. Nor was there any proof of lost profit advanced by Plaintiff.

Conclusion

*7 For all of the above reasons, I find that First Chicago has failed to prove its claim for breach of contract and hereby order that the Clerk of Court enter judgment in favor of Ackerley and close this case.

SO ORDERED.

2001 WL 15693 (S.D.N.Y.)

END OF DOCUMENT